UNITED STATES of America, Plaintiff,

v.

Marshall B. COYNE, Defendant.

Civ. A. No. 81–0656.

United States District Court,
District of Columbia.

Dec. 23, 1981.

A. Patricia Frohman, Asst. U. S. Atty., Washington, D. C., for plaintiff.

David M. Schlitz and Richard O. Duvall, Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This case came on for trial to the Court on November 2, 1981. Based upon the testimony adduced at trial, the trial exhibits, the arguments of counsel, and the entire record, the Court issues the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Defendant Marshall B. Coyne has owned at least fifty (50) percent of the stock of a corporation by the name of Roscoe-Ajax Construction Company, Inc. (Roscoe-Ajax) at all times relevant to this case. Agreed Statement of Facts, ¶ 4. Moreover, subsequent to 1971, Coyne has repeatedly claimed to be the sole owner of Roscoe-Ajax. Plaintiff's Exhibits 5, 6; Defendant's Exhibit E, ¶ 8.

2. The defendant has been a director of Roscoe-Ajax and its predecessor corpora-

tions since 1947. Defendant's Answer to Interrogatory No. 2, Trans. 10–15. In every annual report of the Roscoe-Ajax Construction Corporation or its predecessor corporations since 1956, the defendant has been listed as corporation president. *Id.*

3. On June 17, 1974, the United States Court of Claims entered a judgment for $36,348.88 against Roscoe-Ajax and in favor of the United States of America. *Roscoe-Ajax Construction Company, Inc. v. United States*, Court of Claims No. 839–71 (Ct.Cl., June 17, 1974, filed as Misc. No. 77–0146). That judgment resulted from a dispute between Roscoe-Ajax and the United States over amounts due under a contract for the construction of missile launch shelters at McGuire Air Force Base in New Jersey. The Court held that $36,348.88 was owing because of overpayments following a contracting officer's decision issued October 25, 1965.

4. The judgment against Roscoe-Ajax remains unpaid despite the demand of the United States for payment. Agreed Statement of Facts, ¶ 3. The company, which ceased to perform construction work in 1964, currently has no property subject to execution which can satisfy the judgment which the United States has against it. *Id.* ¶¶ 5, 13. Moreover, the 1973, 1974, and 1975 federal income tax returns of Roscoe-Ajax demonstrate that for those years the corporation's liabilities greatly exceeded its assets. Plaintiff's Exhibits 3–6.

5. On or about March 20, 1975, $49,-227.56 was paid to Marshall B. Coyne from the Joint Venture Bank Account of Roscoe-Ajax and the Knickerbocker Construction Corporation [Joint Venture Account]. On or about May 9, 1975, $15,281.23 was paid to the defendant from the same account. David Morgulas served as trustee of the Joint Venture Bank Account. Agreed Statement of Facts, ¶¶ 8, 9.

6. The March 20, 1975 payment was made pursuant to an agreement of August 18, 1966. *Id.* ¶ 8. The agreement stated that defendant had advanced $962,643.50 to the corporation and that the corporation did not have sufficient cash to repay the ad-

vances. Defendant's Exhibit C, at 2 & Schedule A. These advances and others had been made by defendant and Charles Rose, the co-owner of Roscoe-Ajax, directly to a joint venture in which Roscoe-Ajax was involved. *Id.* at 2. When the co-venturer, Knickerbocker Construction Corporation, learned of the direct advances to the venture, it objected and demanded that the advances be made directly by Roscoe-Ajax, in accordance with the terms of the Joint Venture Agreement. *Id.* at 2–3. Subsequently, Roscoe-Ajax assumed the obligation for the advances, and the advances were recorded as investments by that corporation. *Id.*

7. Coyne executed a personal indemnity to the bonding company in connection with the joint venture and made himself liable to provide collateral for any claims against the joint venture. *Id.* at 3. Because of these facts, Roscoe-Ajax agreed to assign over to Coyne a one-half interest in any sums that might become due to the corporation as a result of its interest in three joint ventures, two of which were with the Knickerbocker Construction Corporation. *Id.* at 4–5. The potential proceeds from these ventures were four or five million dollars. Testimony of Joseph P. Certa, Trans. 39.

8. To avoid having to sign an agreement with himself, Coyne resigned as president of Roscoe-Ajax. Testimony of Joseph P. Certa, Trans. 32. Joseph Certa signed as president of Roscoe-Ajax, an office he retained only until the next election. *Id.* 32–33.

9. An uncertified balance sheet compiled by Roscoe-Ajax's accountant and obtained from defendant's former counsel, stated that on August 30, 1966, some 12 days after the assignment agreement, the corporation's liabilities exceeded its assets. The letter, dated May 11, 1970, to which the balance sheet was attached, indicated that, subsequent to the 1966 agreement, the assignment to Coyne had been reinstituted on the books of Roscoe-Ajax. Plaintiff's Exhibit 7.

10. An agreement, dated September 17, 1971, between Coyne and the executors of

the estate of Charles Rose confirmed the validity of the August 18, 1966 assignment of the joint venture proceeds to Coyne. Defendant's Exhibit E.

11. A letter, dated May 28, 1975, from David Morgulas, trustee of the Joint Venture Account, to the accountants for Roscoe-Ajax detailed disbursements made from the account. Plaintiff's Exhibit 2. Listed were the two payments to Coyne described in Finding of Fact No. 5, *supra*, two other checks to Coyne in payment for advances he had made to the Joint Venture, and a payment to Marshall B. Coyne Corp. to cover a third advance to the Joint Venture. *Id.* The letter concluded that approximately $7,500 remained in the account "to which Marshall would be entitled to receive 60% and Knickerbocker 40%. This is only a rough approximation and I would not want to be held to what happens to this balance until I have cleared it both with Marshall and Knickerbocker." *Id.*

12. The United States filed this suit against defendant Coyne on March 19, 1981. In Count I, the complaint alleges that the payments from the Joint Venture Account to Coyne were illegal under 31 U.S.C. §§ 191–92 because the corporation was insolvent at the time of these payments and payment to Coyne violated the priority claim of the United States. Count II of the complaint alleges that the payments were illegal under decisions on corporate law in the District of Columbia because they constituted an illegal preference to an officer of an insolvent corporation.

## CONCLUSIONS OF LAW

Disposition of this case depends on a single legal issue: whether an "assignment" of a corporation's major assets to the president and dominant shareholder of that corporation can defeat a judgment of the United States against the corporation, when the assignment caused the corporation's liabilities to exceed its assets and when the judgment arose out of events which took place before the assignment. The Court deter-

mines that the facts of this case, under both the cases interpreting the priority statute, 31 U.S.C. §§ 191–92, and the case law of the District of Columbia, mandate that the payment to Coyne not be allowed to prevail over the judgment of the United States.[1]

### A. *The Priority Statute.*

The priority statute provides: "[w]henever any person indebted to the United States is insolvent . . . the debts due to the United States shall be first satisfied . . . ." 31 U.S.C. § 191. The statute also mandates:

Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid.

*Id.* § 192.

Courts have long recognized the need to construe this statute liberally. As early as 1832 the Supreme Court noted that the important policy of raising revenue underlies the priority statute and that "as that policy has mainly a reference to the public good, there is no reason for giving to [the statute] a strict and narrow interpretation," *United States v. State Bank of North Carolina,* 31 U.S. (6 Pet.) 29, 35, 8 L.Ed. 308 (1832), *quoted in United States v. Moore,* 423 U.S. 77, 81–82, 96 S.Ct. 310, 313–314, 46 L.Ed.2d 219 (1975). This liberal consideration of the statute has led the Supreme Court to state that the technicalities of the common law need not be read into the statute. *United States v. Moore, supra,* 423 U.S. at 83–84, 96 S.Ct. at 314–315. Similarly, the priority statute "is not to be defeated by unnecessarily restricting the application of the word 'debts' within a narrow or technical meaning." *Price v. United States,* 269 U.S. 492, 500, 46 S.Ct. 180, 181, 70 L.Ed. 373 (1926).

---

1. Because the Court relies on these two theories in rendering its judgment, it need not address the plaintiff's argument that the assignment should have been recorded under D.C. Code § 28:9–302 (1981).

Under the statute, a corporation is insolvent if its liabilities exceed its assets. *Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349, 353 (9th Cir. 1965); *In re Gottheiner*, 3 B.R. 404, 408 (Bankruptcy Ct., N.D.Cal.1980). The defendant has admitted that Roscoe-Ajax was insolvent in 1975 when the payments were made to Coyne from the Joint Venture Account. Moreover, the balance sheet of the corporation from a time more or less contemporaneous with the "assignment" to Coyne indicates that liabilities exceeded assets. The defendant argues that this balance sheet is not accurate because it does not include the claims covered by the August 16, 1966 assignment and that these claims were the corporation's largest asset, but this argument only demonstrates more clearly that the assignment had the effect of depriving the corporation of that one asset or group of assets out of which creditors' claims might be satisfied. The assignment had the further effect of exacerbating the corporation's precarious financial situation, while guaranteeing payment of "debts" owed to a corporation insider.[2] Whether or not the "assignment" caused Roscoe-Ajax to become insolvent in 1966, the transaction inevitably caused its future insolvency.

The events which eventually led to the United States' judgment against Roscoe-Ajax occurred before the August 18, 1966 transaction. The construction work which caused the controversy must have been completed prior to 1964 when the corporation ceased doing any construction work. Moreover, the overpayment to Roscoe-Ajax was authorized in October 1965. Priority under 31 U.S.C. § 191 is established when the indebtedness first accrues even if "formal claim or assessment does not occur until years later." *United States v. 58th Street Plaza Theater, Inc.*, 287 F.Supp. 475,

496 (S.D.N.Y.1968). Thus, the debt to the United States accrued before August 1966.

Moreover, even if, assuming for the sake of argument, the debt to the United States did not accrue until after August 18, 1966, the Supreme Court has made it clear that "[t]he statute's express command is that 'debts due the United States shall be first satisfied'; its language looks to the time of payment rather than the moment at which the assignment of obligation is made." *United States v. Moore, supra*, 423 U.S. at 83, 96 S.Ct. at 314. The "payment" in this case occurred in 1975 when Roscoe-Ajax clearly was insolvent. The United States had priority at this time, and the "assignment" to Coyne cannot be used to circumvent the clear mandate of the statute.

Section 192 makes any "executor, administrator, or assignee, or other person" personally liable if he pays a debt due by the person for whom he acts before he satisfies the debts due the United States. This language encompasses any corporate officer who acts to prefer any creditor of an insolvent corporation over the claims of the United States. *See Lakeshore Apartments, Inc. v. United States, supra*, 351 F.2d at 353; *In re Gottheiner, supra*, 3 B.R. at 408. In this case, it is clear that Coyne was in complete control of Roscoe-Ajax long before the 1966 transactions. Indeed, Coyne seems to have disregarded the corporation altogether in making his advances to the joint venture, and it was only after Knickerbocker objected to the form of these advances that they were restructured to funnel them through Roscoe-Ajax. This action illustrates a whole pattern of conduct during which Coyne acted as if he, not Roscoe-Ajax, were a member of the joint venture.[3]

2. In effect a "debt" of 2 million dollars was satisfied by giving Coyne and the Rose estate a potential recovery of 4–5 million dollars. In fact, between 2 and 2½ million dollars were actually recovered. Certa testimony, Trans. 40.

3. By 1966 the corporation was only a shell, continuing, mainly through the efforts of Coyne, to collect on the claims due it but doing no new business. Indeed, later advances made to the joint venture were not made by the corporation but by Coyne or another of his corporations. *See* Finding of Fact No. 11, *supra*. When the trustee found that some money was left in the account, he evidently sought instructions from Coyne personally and not from the corporation. On the other hand, his inquiry to Knickerbocker was to the corporation. *See* Finding of Fact No. 11, *supra*.

An individual cannot be allowed to use an "assignment" to himself to avoid paying claims due to the United States when this transaction has the effect of leaving the corporate debtor a shell with no assets.

*District of Columbia Common Law*

 An alternate source of Coyne's liability lies in the business law of this jurisdiction. In *Tauber v. Noble*, 172 A.2d 552 (D.C.Mun.Ct.App.1961), the court imposed a constructive trust on an officer, director, and majority shareholder of a corporation when the officer had transferred the major asset of a corporation to himself as payment of his "loans" to the corporation, leaving the corporation unable to pay its other creditors. The applicable definition of insolvency in that case was that "the corporation is unable to pay its debts as they become due." D.C.Code § 29–302(14) (1981) (formerly § 29–902(n)). Under this definition, Roscoe-Ajax was clearly insolvent in 1966, for the August 18, 1966 agreement recites that the corporation did not have enough cash to pay the claims of the Rose Estate. An insolvent corporation cannot give preference to an insider-creditor, such as a director, officer, or shareholder. *Tauber v. Noble, supra,* 172 A.2d at 554. If it does, a constructive trust will be imposed on the funds received by the insider. Thus the $49,227.56[4] preferential payment to Coyne makes him liable for the debt which the corporation owes the United States.

## CONCLUSION

The defendant is liable to the United States for the sum of $36,348.88 under either of the legal theories advanced by the plaintiff. The transaction, even if it can be classified as an "assignment," in effect left the corporation a shell without significant assets. Therefore, the defendant shall pay $36,348.88 to the United States within thirty (30) days of this Memorandum.

4. Because the March 20, 1975 payment of $49,-227.56 constituted an illegal preference, the Court need not inquire into the status of the

May 9, 1975 payment of $15,281.23, which the defendant claims was paid as a result of certain transactions between Coyne and Joseph Certa.