85 F.3d 1015
 77 A.F.T.R.2d 96-2477, 96-1 USTC P 60,233
 UNITED STATES of America, Plaintiff-Appellee,
v.
James M. COPPOLA, Jr., individually and as executor of the
Estate of James M. Coppola, Sr., and Barbara
Coppola, Defendants-Appellants,
Ida Coppola and George Coppola, as executors of the Estate
of James M. Coppola, Sr., Defendants.
 No. 393, Docket 95-6012.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 7, 1995.
Decided June 10, 1996.
 
 Michael I. Saltzman, New York City (Robert P. Lewis, Baker & McKenzie, New York City, of counsel), for defendants-appellants.
 Randolph L. Hutter, Washington, DC (Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Charles E. Brookhart, Tax Division, Department of Justice, Washington, DC, Zachary W. Carter, United States Attorney for the Eastern District of New York, of counsel), for plaintiff-appellee.
 Before NEWMAN, Chief Judge, and OAKES and CABRANES, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 This action by the United States against the executors of the estate of James M. Coppola, Sr. seeks to recover unpaid estate taxes. On November 22, 1994, after a two-day bench trial, the United States District Court for the Eastern District of New York (Jack B. Weinstein, Judge ) entered judgment for the United States, holding defendant-appellant James M. Coppola, Jr., one of the executors, personally liable for taxes due, on several different theories: (1) James Jr. entered into an agreement distributing the estate's assets to himself, his mother, and his brother without first satisfying the estate's obligations to the United States, in violation of 31 U.S.C. § 3713(b); (2) he breached his fiduciary duty to the estate under New York law; (3) he was a distributee of the estate under § 12-1.1 of the New York Estates, Powers and Trusts Law; and (4) he transferred assets out of the estate and into his own corporations, thereby engaging in a series of fraudulent conveyances under the New York Debtor and Creditor Law. In addition, the court ordered that all assets distributed from the estate be restored to it.
 
 
 2
 On appeal, James Jr. contends that many of the district court's factual findings were clearly erroneous and challenges all of the district court's legal conclusions. We affirm.
 
 I. BACKGROUND
 
 3
 The following facts are drawn primarily from the district court's opinion. See United States v. Coppola, No. CV-88-3456 (JBW), 1994 WL 665751 (E.D.N.Y. Nov. 17, 1994).
 
 
 4
 Before the death of James Sr., on June 28, 1975, the Coppola family owned and operated several construction-related businesses. These family businesses included three New York corporations ("the New York Corporations")--G.I.J. Realty, Cobra Pile Driving, and G.I.J. Equipment--and a Florida partnership, The Coppola Company. James Sr. owned 80 percent of G.I.J. Realty, 25 percent of Cobra Pile Driving, and 25 percent of G.I.J. Equipment, and he was a 25-percent partner in The Coppola Company. Before James Sr.'s death, G.I.J. Realty and Cobra Pile Driving borrowed money from Franklin National Bank, secured respectively by real estate owned by G.I.J. Realty on Strickland Avenue in Brooklyn, New York ("the Strickland Property"), and construction equipment owned by G.I.J. Equipment. The loans were guaranteed by the Coppola companies and by various members of the Coppola family, including James Sr., his wife, Ida, and his sons, James Jr. and George.
 
 
 5
 James Sr.'s last will and testament provided that most of his property, including his interests in the various family businesses, be placed in a trust, paying income for life to Ida, and upon her death, to James Jr. and George for life, and thereafter to each of his grandchildren. Under the terms of the will, James Jr., George, and Ida were to serve as co-executors of the estate and as co-trustees of the projected trust. Ida had sole discretion to appoint all or part of the principal of the trust fund to James Sr.'s living issue. The will was probated without contest in the Surrogate's Court of Kings County, New York in July 1975. It is not disputed that the executors never established the trust contemplated by the will and that Ida never exercised her power of appointment.
 
 
 6
 After James Sr.'s death, the executors retained a law firm selected by James Jr. to prepare a federal estate tax return; James Sr.'s combined interests in the New York Corporations was reported to exceed $500,000. Shortly after the filing of the tax return in September 1976, the Internal Revenue Service claimed there was a deficiency in the estate tax paid, resulting in part from an undervaluation of James Sr.'s interest in the New York Corporations. According to George Coppola, discussions between the IRS and members of the Coppola family, including James Jr., regarding the alleged tax deficiency continued for several years before the issuance of a statutory notice of deficiency on August 1, 1979. The district court determined that, as a result of these discussions, James Jr. received notice of the IRS's claim against the estate for unpaid taxes on or before May 13, 1977.
 
 A. The 1977 Agreement
 
 7
 On May 13, 1977, James Jr., George, and Ida entered into an Agreement and Plan of Reorganization ("the Agreement" or "1977 Agreement") to divide the various family businesses among themselves in derogation of the terms of James Sr.'s will. Under the Agreement, James Jr. was to obtain sole ownership and control of the New York Corporations and, in turn, to transfer his interest in the Florida Company to Ida and George. Each party was required to pay any estate taxes due in proportion to the value of the assets each received.
 
 
 8
 Shortly after the Agreement was signed, the family members began to dispute their compliance with their respective obligations. Ida and George contested James Jr.'s control over the New York Corporations and, according to James Jr., "removed" him as an officer--although James Jr. nevertheless apparently maintained control and represented himself as the sole shareholder to various third parties.
 
 
 9
 B. Foreclosures on the Equipment and the Real Estate and Transfers of Assets to James Jr.
 
 
 10
 In the meantime, G.I.J. Realty and Cobra Pile Driving defaulted on their loans from Franklin National Bank, and its successor, the European American Bank ("EAB"), sought to recover the outstanding debt. In February 1977, EAB commenced action against G.I.J. Equipment as the guarantor of the $350,000 loan to Cobra Pile Driving. It obtained a judgment and later foreclosed on construction equipment owned by G.I.J. Equipment, valued at over $800,000. EAB obtained title to the equipment on December 12, 1977, but agreed to let G.I.J. Equipment, managed by James Jr., retain actual possession. In January 1978, EAB resold the equipment to James Jr. for approximately $400,000.[1] He promptly placed the title to the equipment in James Coppola Trucking, Inc.--a new corporation wholly owned and controlled by him--in order to avoid claims to the property by Ida, George, or the estate.
 
 
 11
 Similarly, in May 1977 (soon after the Coppolas signed the 1977 Agreement), G.I.J. Realty defaulted on its mortgage on the Strickland Property, now also held by EAB. On October 17, 1977, EAB brought foreclosure proceedings for $660,914.74 owed on the mortgage, and on July 21, 1978, it obtained a default judgment on the property, previously valued at $1.7 million. Although the property was auctioned at a foreclosure sale on March 7, 1979, no bids were offered and EAB ultimately took title. G.I.J. Realty, still operated by James Jr., never relinquished possession of the Strickland Property. On May 15, 1979, the Coppola Realty Corp.--a new corporation wholly owned by James Jr.--purchased the property for $908,739.43.
 
 
 12
 On August 1, 1979, the IRS issued its statutory notice of deficiency to the estate, and on August 12, 1982, the United States Tax Court filed a decision, stipulated to by the parties, finding that the estate had a tax deficiency of $166,633. Including interest, the estate's total tax liability to the United States stood at $910,405.99 as of September 30, 1994.
 
 C. The District Court Proceedings
 
 13
 In 1988, the United States brought this action in the district court against the defendants to reduce to judgment the unpaid federal tax liabilities of the estate, as well as the individual tax liabilities of James Jr. and his wife, Barbara Coppola.[2] In its Amended Complaint, filed March 21, 1989, the United States sought, among other things, a declaration that James Jr. fraudulently conveyed the estate's assets to himself and others and a judgment against James Jr., individually, in an amount equal to the assets received by him from the estate.
 
 
 14
 James Jr. was the only witness to testify at trial; the parties submitted the deposition testimony of Ida and George. James Jr. testified that in November 1975, EAB asked for new cross-corporate and personal guarantees on its loans to the family-owned corporations, but that George and Ida had refused to provide them. According to James Jr., after EAB demanded full payment of the outstanding loans, he tried to negotiate to restructure the debt, but because Ida and George would not cooperate with him, he was unable to demonstrate the requisite authority to enter an agreement to pay off the debts. James Jr. testified that he had entered into the 1977 Agreement in order to obtain sole authority to negotiate with EAB on behalf of the New York Corporations and thus salvage them.
 
 
 15
 In addition to the facts outlined above, the district court found that James Jr. allowed Cobra Pile Driving and G.I.J. Realty to go into default on their loans, thereby permitting EAB to foreclose on the property, whose value far exceeded the estate's obligation to the bank. The district court further noted that, rather than sell the property and satisfy the estate's tax obligation to the United States and its obligation on the loans to EAB, James Jr. engaged in a series of transactions that permitted him to repurchase the property through his corporations, "creat[ing] the illusion that he ... obtained title to property, free from claims of the United States."
 
 
 16
 The district court specifically found that James Jr. was aware that the estate faced undetermined federal tax liability (1) when he signed the 1977 Agreement with Ida and George, attempting to transfer ownership of the New York Corporations to himself; (2) when he "permitted" the foreclosures by EAB to proceed; and (3) when the newly formed corporations that he controlled reacquired the assets of G.I.J. Equipment and G.I.J. Realty. The court held, inter alia, that James Jr., as an executor of the estate, was personally liable for taxes owed to the United States by the estate because he distributed its assets to himself, his mother, and his brother, without first satisfying the estate's federal tax debt, in violation of the federal insolvency statute, 31 U.S.C. § 3713(b). In the alternative, it held that James Jr. was personally liable for the estate taxes because (1) he breached his fiduciary duty to the estate through self-dealing, by permitting foreclosure upon the equipment and the Strickland Property--rather than selling it to satisfy the estate's obligations to EAB and the United States--and later repurchasing it for his exclusive benefit without satisfying the estate's federal tax liabilities; (2) he was a distributee of the assets of the estate under § 12-1.1 of the New York Estates, Powers and Trusts Law; and (3) he engaged in a series of fraudulent conveyances by which he transferred assets out of the estate for his exclusive benefit and defeated the claims of creditors of the estate, in violation of the New York Debtor and Creditor Law. The court ordered that the equipment and the Strickland Property be returned to G.I.J. Equipment and G.I.J. Realty, respectively, and that the interests of James Sr.'s estate in those two corporations be returned to the estate.
 
 
 17
 On November 22, 1994, the district court entered judgment against the executors of the estate and James Jr., personally, in the amount of $910,405.99 plus interest, and against James Jr. for attorneys' fees expended by the United States in bringing this action.
 
 
 18
 On appeal, James Jr. contends that the district court erred by holding him liable (1) under 31 U.S.C § 3713(b) because, inter alia, the district court's finding that he had actual notice of the IRS's claim for additional estate taxes was clearly erroneous; (2) as a transferee of property fraudulently conveyed from the estate in violation of the New York Debtor and Creditor Law, because (a) the transfer of assets by virtue of EAB's foreclosures was not the result of James Jr.'s voluntary actions, (b) the record showed no evidence of fraudulent intent and the district court's finding of actual fraud was clearly erroneous, and (c) the conveyance of assets to corporations wholly owned by James Jr. was made for fair consideration; (3) under New York Estates, Powers and Trusts Law § 12-1.1, because he did not receive property from the estate as a distributee or a testamentary beneficiary; and (4) for breach of fiduciary duties, because its holding was based on clearly erroneous findings of fact and conclusions of law. The United States urges affirmance of the district court's judgment on all four theories of liability.
 
 II. DISCUSSION
 
 19
 After a bench trial, we will set aside a district court's findings of fact only if they are clearly erroneous. FED. R. CIV. P. 52(a); Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1574 (2d Cir.1994). However, we review all conclusions of law, including those derived from the application of a court's findings of fact, de novo. Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866, 870 (2d Cir.1994).
 
 
 20
 A. James Jr.'s Personal Liability: The Federal Insolvency Statute, 31 U.S.C. § 3713
 
 
 21
 The federal insolvency statute, 31 U.S.C. § 3713,[3] enacted in 1982 as the successor to 31 U.S.C. § 191 and a line of federal insolvency statutes dating from 1789, see United States v. Moore, 423 U.S. 77, 81, 96 S.Ct. 310, 313, 46 L.Ed.2d 219 (1975), provides that when a person is insolvent or an estate has insufficient assets to pay all of its debts, priority must be given to debts due the United States. 31 U.S.C. § 3713 states in relevant part:
 
 
 22
 (a)(1) A claim of the United States Government shall be paid first when--
 
 
 23
 (A) a person indebted to the Government is insolvent and--
 
 
 24
 (i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
 
 
 25
 (ii) property of the debtor, if absent, is attached; or
 
 
 26
 (iii) an act of bankruptcy is committed; or
 
 
 27
 (B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.
 
 
 28
 ....
 
 
 29
 (b) A representative of ... an estate ... paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.
 
 
 30
 (Emphasis added.)
 
 
 31
 Accordingly, by the statute's express terms, liability is imposed on a representative of a debtor, including an executor of an estate, who pays a debt of the estate to another in derogation of the priority of debts owed to the United States, thereby rendering the estate insolvent. In order for liability to attach, the executor must have knowledge of the debt owed by the estate to the United States or notice of facts that would lead a reasonably prudent person to inquire as to the existence of the debt owed before making the challenged distribution or payment. In re Gottheiner, 703 F.2d 1136, 1140 (9th Cir.1983); Want v. Commissioner, 280 F.2d 777, 783 (2d Cir.1960); Huddleston v. Commissioner, 67 Tax Ct. Mem. Dec. (CCH) 2521, 2524, 1994 WL 100520 (1994). Of course, the executor's liability is limited to the extent of the payment or value of the assets he distributes from the estate prior to the payment of the taxes. 31 U.S.C. § 3713(b).
 
 
 32
 In recognition of the federal insolvency statute's broad purpose of securing adequate revenue for the United States Treasury, courts have interpreted it liberally. See Moore, 423 U.S. at 81-82, 96 S.Ct. at 313-14; United States v. Key, 397 U.S. 322, 324, 90 S.Ct. 1049, 1051, 25 L.Ed.2d 340 (1970). There is no question that taxes owed to the United States fall within the scope of a "claim of the Government" under the statute's broad terms. See Massachusetts v. United States, 333 U.S. 611, 625-26, 68 S.Ct. 747, 755-56, 92 L.Ed. 968 (1948). Courts have also taken an expansive view of the type of payments or "distributions" from the estate for which an executor may be held liable. Indeed, in Want, 280 F.2d at 783, we specifically held that a fiduciary, e.g., an executor, may be held liable under the federal insolvency statute "for a distribution of funds [from the estate] that is not, strictly speaking, the payment of a debt."
 
 
 33
 In the instant case, the district court found that James Jr. was personally liable for the unpaid estate taxes as executor under § 3713 because he stripped the estate of all of its assets and rendered it insolvent by entering the 1977 Agreement: "James Jr's status as a fiduciary with sufficient knowledge of the United States' claim for federal estate taxes, who as an executor of the estate, provided for the distribution of all of the estate assets to himself, his brother, and his mother, subjects him to liability under 31 U.S.C. § 3713(b)." While we acknowledge that the division of the estate's assets under the 1977 Agreement does not constitute an actual payment of a "debt" of the estate, we find--consistent with other courts' broad interpretation of § 3713--that James Jr.'s participation in the Agreement without payment of debts owed to the United States renders him liable under the insolvency statute. While James Jr. did not defeat the Government's tax claim against the estate by paying a debt of the estate, he depleted the assets of his father's estate by distributing them to himself and his family, thereby preventing payment of the tax debt. Such conduct certainly falls within the broad prohibitions of the federal insolvency statute. See Want, 280 F.2d at 783; see also In re Gottheiner, 703 F.2d at 1138-40 (finding insolvent corporation's sole shareholder liable under federal insolvency statute for loans and payments made to himself at a time when the corporation was insolvent and had not satisfied its debt to the United States); United States v. Coyne, 540 F.Supp. 175, 180 (D.D.C.1981) (corporate officer liable under federal insolvency statute where his "assignment" of corporation's assets to himself to avoid payment of corporate debt to the United States rendered the corporation insolvent).
 
 
 34
 We reject James Jr.'s contention that the district court erroneously found that he had notice of the IRS's claim when the relevant transfers were made. While it is true that the IRS did not issue its notice of deficiency on the estate taxes until August 1, 1979--over two years after the Agreement was signed and James Jr. had acquired sole ownership and control of the New York Corporations--there is substantial evidence on the record to support the court's finding that James Jr. had the requisite notice at the time he signed the Agreement on May 13, 1977. As noted above, the law permits a finding of notice where the executor lacks actual notice of the liability but possesses notice of such facts as would lead a reasonable person to inquire as to the existence of unpaid claims. We affirm the district court's finding that discussions and negotiations between the executors and the IRS about an alleged tax deficiency prior to the signing of the 1977 Agreement, and the Agreement's explicit reference to the "estate tax obligations" of the estate, were sufficient to put James Jr. on notice of the tax liability for purposes of § 3713. At the very least, he was obligated to inquire further before the assets were distributed pursuant to the 1977 Agreement.
 
 
 35
 James Jr. contends that the relevant transfers for purposes of § 3713 liability are not those associated with the transfer of the estate's stock under the 1977 Agreement, but rather, the EAB foreclosures on the equipment and the Strickland Property. Because we find that the effective total depletion of the estate's assets by the 1977 Agreement is sufficient to render James Jr. personally liable for the estate taxes under the federal insolvency statute,[4] we need not reach the question of whether the foreclosures on the property of the New York Corporations and the subsequent transfers also subjected him to liability.
 
 
 36
 The district court also found James Jr. personally liable for the unpaid estate taxes on the alternative grounds that (1) he breached his fiduciary duty to the estate in violation of New York law, and (2) he was a distributee of the estate under New York Estates, Powers and Trusts Law § 12-1.1. Inasmuch as we find § 3713 sufficient to render him liable for the full amount of the unpaid taxes, plus interest assessed, we do not find it necessary to address these other theories of liability.
 
 
 37
 B. Returning the Assets to the Estate: James Jr.'s Fraudulent Conveyances
 
 
 38
 In the proceedings below, the IRS sought an order requiring the return of all the assets to the estate, so that those assets might be used to pay the taxes owed. The district court's conclusion that transfers of the estate's assets into corporations wholly owned by James Jr. constituted actual fraudulent conveyances under § 276 of the New York Debtor and Creditor Law provides a sound basis for voiding the transactions and returning the assets to the estate. We affirm the finding that the conveyances were fraudulent and conclude that the district court's order was proper.[5]
 
 
 39
 The district court found that both the 1977 Agreement and the transfers of the assets of the New York Corporations into corporations solely owned by James Jr. constituted actual fraudulent conveyances under New York Debtor and Creditor Law § 276.[6] While direct proof of fraudulent intent is often difficult to establish, courts frequently infer it from the debtor's course of conduct. See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1041 (2d Cir.1984) ("The fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transactions and the secrecy of the sale, ... or from inadequacy of consideration and hasty, unusual transactions." (citations omitted)). We find that, for purposes of § 276, the district court properly viewed the various conveyances at issue as part of an integrated scheme, rather than as individual transfers and transactions. See, e.g., United States v. Cohn, 682 F.Supp. 209, 217 (S.D.N.Y.1988). In keeping with that approach, we examine the alleged scheme in its entirety to determine whether the district court properly found actual fraudulent intent.
 
 
 40
 The record clearly supports the district court's finding that each of the relevant transfers was part of a deliberately fraudulent scheme to put the assets of the estate beyond the reach of its creditors. First, the 1977 Agreement, which distributed the estate's interests in the various family-owned corporations to the surviving family members, is a strong indicator of fraudulent intent insofar as it was executed in clear violation of James Sr.'s will and at a time when the executors had actual notice of additional tax liability. The transfers of the equipment and the Strickland Property, through the EAB foreclosure proceedings, provide further evidence that James Jr. deliberately sought to acquire the corporations and assets of the estate free from the claims of both its creditors and other members of his family. As the district court found, (1) James Jr. permitted EAB to foreclose on over $800,000 worth of equipment owned by G.I.J. Equipment by deliberately allowing Cobra Pile Driving to go into default on its $350,000 loan when there were assets available to pay the amount due; (2) James Jr. retained possession and use of the equipment after the foreclosure and, shortly thereafter, raised over $400,000 to repurchase the equipment free of all claims; and (3) he created a new corporation, of which he was the sole shareholder, to take ownership of the equipment. Similarly, James Jr. obtained sole possession of the Strickland Property by allowing G.I.J. Realty to go into default on its unpaid loan balance for approximately $650,000 in May 1977, thereby precipitating the foreclosure on the Strickland Property, previously valued at $1.7 million; subsequently repurchasing the property for approximately $900,000; and ultimately obtaining title in the name of a new corporation of which he was the sole owner. It is clear from the record that the companies were not so financially burdened that they were forced to go into default on the loans and that the market value of the assets foreclosed upon was such that James Jr. could have sold them on his own and satisfied all creditors. Moreover, despite the foreclosure sales, James Jr. never relinquished possession of either the equipment or the property. Perhaps the most persuasive evidence supporting the conclusions of the district court is that James Jr. managed to raise over $400,000 for the repurchase of the equipment only a few months after its foreclosure and that he sought financing for the "repurchase" of the Strickland Property even before the execution sale of that property occurred.
 
 
 41
 In short, the record supports the district court's findings and conclusions that the various transfers and conveyances, viewed as a single scheme, served to hinder, delay, and defraud the United States in its efforts to collect the estate's unpaid taxes. We have considered James Jr.'s arguments to the contrary and we find them to be without merit.
 
 
 42
 Because the conveyances at issue were properly found to be fraudulent under § 276 of the New York Debtor and Creditor Law, we affirm the district court's order declaring void the distribution of the estate's assets under the 1977 Agreement and the transfers from the estate, through foreclosure proceedings, to corporations wholly owned and controlled by James Jr. Accordingly, we also affirm the court's order that the equipment and the Strickland Property be returned to G.I.J. Equipment and G.I.J. Realty, respectively, and that the interests of the estate in those corporations be returned to the estate. See New York Debtor and Creditor Law § 278(1)(a) ("Where a conveyance ... is fraudulent as to a creditor, such creditor, when his claim has matured, may ... [h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim.").
 
 CONCLUSION
 
 43
 To summarize:1. We affirm the district court's order that James Jr. be held personally liable for unpaid estate taxes under 31 U.S.C. § 3713 on the ground that he distributed the estate's assets under the 1977 Agreement, rendering the estate insolvent, before satisfying its tax debt to the United States. We also affirm the district court's determination that James Jr. was aware of sufficient facts to place him on notice of the estate's tax liability at the time he signed the 1977 Agreement.
 
 
 44
 2. We affirm the district court's order that the assets of G.I.J. Equipment and G.I.J. Realty be returned to those corporations and that the estate's interests in those corporations be returned to the estate. We do so on the ground that the distribution of the assets of the estate by virtue of the 1977 Agreement and the transfers of assets, through the foreclosure proceedings, into corporations wholly owned by James Jr. were fraudulent conveyances under New York Debtor and Creditor Law § 276.
 
 
 45
 The judgment of the district court is affirmed.
 
 
 
 [1]
 James Jr. purchased the equipment with $225,000 of his own money and $175,000 of his mother's money
 
 
 [2]
 In view of the 1977 Agreement, by which James Jr. purportedly relinquished his interest in The Coppola Company, the IRS disallowed his claim for fifty percent of the company's losses on his 1978 personal income tax return attributed to his asserted interest in the company. This disallowance resulted in a deficiency in the joint personal income tax payments of James Jr. and Barbara Coppola
 Barbara Coppola, a co-defendant below based on her individual tax liability, also filed a notice of appeal, but the issues raised on appeal only concern James Jr.'s liability for the unpaid estate taxes. Accordingly, we do not discuss the facts relevant to the question of Barbara Coppola's individual tax liability in any detail.
 
 
 [3]
 In 1982, Congress amended the federal insolvency statute, formerly codified at 31 U.S.C. § 191 (1976). Insofar as no substantive changes were adopted, see H.R. REP. NO . 651, 97th Cong., 2d Sess. 1-3 (1982), reprinted in 1982 U.S.C.C.A.N. 1895, 1895-97, we rely on case law preceding the 1982 amendment in interpreting the current version of the insolvency statute. See also United States v. Cole, 733 F.2d 651, 653-54 & n. 1 (9th Cir.1984)
 
 
 [4]
 We are unpersuaded by James Jr.'s argument that the 1977 Agreement is irrelevant because the transfer of the estate's stock in the New York Corporations to James Jr. never occurred due to disputes with his mother and brother. The record adequately supports the district court's finding that James Jr. (1) acquired sole ownership and control of the New York Corporations; (2) represented to third parties that he controlled the Corporations; and (3) used the Agreement as a shield from litigation in Florida
 
 
 [5]
 In examining whether the transfers from the estate to James Jr.'s corporations were fraudulent under New York law, the district court analyzed both whether the transfers could be deemed "constructively" fraudulent--i.e., made without fair consideration and rendering the debtor insolvent--under § 273 of the New York Debtor and Creditor Law, and whether the transfers were "actually" fraudulent--i.e., made with actual intent to defraud creditors--under § 276 of the New York Debtor and Creditor Law. Because we find that the district court properly concluded that the transfers constituted actual fraudulent conveyances, we need not examine its conclusion as to constructive fraud
 
 
 [6]
 Section 276 provides:
 Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
 N.Y. DEBT. & CRED. LAW § 276 (McKinney 1990) (emphasis added).