115 F.3d 136
 118 Ed. Law Rep. 846
 FDIC as Conservator for Crossland Federal Savings Bank,
Plaintiff-Appellee,
v.
PROVIDENCE COLLEGE, Defendant-Appellant,
A R Construction, Inc., Westminster Construction, Inc.,
doing business as Westminster Construction, Co.,
Bernard Renzi, Philip B. Renzi, Attilia
Renzi and Philip Renzi, Defendants.
 No. 327, Docket 96-6097.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 30, 1996.
Decided June 2, 1997.
 
 Mailman & Gigante, New York City (Gary Mailman, of counsel), for Defendant-Appellant.
 Cullen & Dykman, Garden City, NY (Peter J. Mastaglio, of counsel), for Plaintiff-Appellee.
 Before: KEARSE, WALKER, and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 In 1987, Providence College (the "College" or "Providence") contracted with two construction companies for a major asbestos abatement project on the campus. The construction companies, both owned by the same family, were evidently short of capital and took out a series of loans from Crossland Savings Bank ("Crossland"). When the first loan was made in 1987, Crossland required the companies' principal officer, Bernard Renzi, to obtain from the College a written guaranty of the companies' loan obligation. Renzi presented the form to his friend, Joseph Byron, the College's Vice President for Business Affairs, who signed it. The guaranty recited that the College would cover all obligations of the companies to the bank--including those incurred in the future--up to a total of $621,000.
 
 
 2
 Crossland[1] commenced this diversity action in the United States District Court for the Eastern District of New York against the construction companies, members of the Renzi family, and the College. The College defended on the grounds that Vice President Byron lacked actual or apparent authority to guarantee the loans on behalf of the College. Judge Nickerson held on summary judgment that Byron lacked actual authority, but that there were issues of fact remaining as to the apparent authority issue. Following a bench trial, the court concluded that Byron had apparent authority to undertake the obligation on the College's behalf and entered judgment against Providence in the amount of $621,000.
 
 
 3
 This appeal concerns the judgment--premised solely on the Byron guaranty--against the College, the lone appellant. The only issue presented is whether the district court erred in finding that Byron had apparent authority. For the reasons set forth below, we reverse.
 
 BACKGROUND
 
 4
 The Project and Financing. Providence College is a nonprofit corporation which maintains and operates an educational institution in Providence, Rhode Island. In 1987, the College undertook a major project to remove asbestos from its buildings. Two companies that had performed various construction-related work for Providence over many years--A R Construction, Inc. and Westminster Construction, Inc. (the "construction companies" or the "Renzi companies")--were the low bidders, and were awarded the contract.
 
 
 5
 In order to finance the costly abatement project, the construction companies sought and obtained a series of loans from Crossland.[2] The loan proceeds were used primarily to finance the asbestos removal at the College; apparently, however, some of the proceeds were used to finance other construction projects undertaken by the companies, not all of which concerned Providence.
 
 
 6
 Crossland, which had never done business with the companies or any of the Renzis individually, sought and obtained detailed information concerning their net worth prior to committing to the initial loan. Bernard Renzi, the President of the construction companies, and members of his family, executed written guaranties for the corporate loan obligations.
 
 
 7
 The Guaranty at Issue. In connection with the first of the series of loans, Crossland evidently demanded that the borrowers furnish a written loan guaranty from the College. At the June 10, 1987 closing on the first loan, Crossland handed to Bernard Renzi an original and execution copies of a form on which Providence's name was typed as "Guarantor." The terms of the guaranty were that Providence would guarantee all obligations of the Renzi companies "whether now existing or hereafter incurred" up to $621,000.
 
 
 8
 Soon thereafter, Renzi brought the forms to Joseph Byron, who at the time was the Vice President for Business Affairs at Providence. (Byron and Renzi had been close friends for about nine years.) Though Byron has no specific recollection, it is undisputed that he executed the forms, that they were notarized by an individual working in the Registrar's office at the College, and that Byron gave the forms back to Renzi, who delivered them to Crossland on or after June 16, 1987. Byron's title did not appear on the forms, and he did not add it. The parties agree that there is no evidence in the record that anyone at Crossland was aware of Byron's identity or title at the time that the forms were received by the bank in June 1987.
 
 
 9
 Appearances of Authority. Because the claim of apparent authority in this case depends upon the conduct of the College vis-a-vis the bank, we recount the communications between those parties in detail. We also pause to highlight that the district court's judgment enforces the guaranty only as to the outstanding balance on the fourth through seventh of the loans made by Crossland. The first three loans were repaid in full by the borrower companies or the Renzis, but Crossland has suffered enough losses on the subsequent loans to claim the full guaranty amount.
 
 
 10
 Prior to the making of the first loan and the delivery of the guaranty form, Crossland had no direct contact with Providence, oral or written. At the time of the second loan (in early 1988), the bank loan officer in charge of the account, Vice President Arnold Kastenbaum, asked his superior whether financial information on Providence was necessary, and was told that it was not because Providence was very strong financially.
 
 
 11
 On October 27, 1987, Byron wrote to the construction companies, advising that completion of the work that was the subject of the first loan would be delayed by a strike at the College. That letter, signed by Byron as Vice President for Business Affairs, was faxed to Crossland on the day it was received, and was placed in Crossland's loan file. The October 27 letter is the earliest evidence that the bank had learned of Byron's title. A second letter from Byron, also bearing his title and also found in Crossland's loan file, is dated December 31, 1987, and passes along advice from the College's Director of Physical Plant that the work in the last two phases of construction was 75 percent complete.
 
 
 12
 The Cunningham Guaranties. In the period from January 1988 to June 1989, Crossland received eleven letters from the Director of Physical Plant, James Cunningham, reporting on the status of the asbestos abatement and the completion of various phases of the work.
 
 
 13
 When the second of the loans was made in February 1988, Crossland sought and received an additional guaranty signed by Cunningham (another close friend of Bernard Renzi), also supposedly on behalf of Providence. This guaranty provided that the College would be liable for all obligations of the Renzi construction companies "whether now existing or hereafter incurred" up to $440,000, the amount of the second loan. In conjunction with the third, fourth, and fifth loans, Cunningham obliged Crossland by executing additional guaranty forms, also covering both the current and future debts of the companies. The guaranty executed by Cunningham in connection with the fourth loan was in the amount of $1,459,500, and the guaranty in connection with the fifth was unlimited in amount. Crossland apparently sought no confirmation of Cunningham's authority to commit the College to this sizable and open-ended liability (which would appear to cover Providence's full endowment, and all its land and buildings), and relied instead on Cunningham's title as Director of Physical Plant.
 
 
 14
 Procedural History. In 1991, Crossland commenced this action, seeking to enforce as against Providence the guaranty that Cunningham had signed when the bank made its second loan. Crossland soon ascertained through discovery that Cunningham was not an officer of Providence. The bank then amended its complaint to predicate the College's liability on the Byron guaranty signed in connection with the first loan.
 
 
 15
 Providence moved for summary judgment on the grounds that Byron had neither actual nor apparent authority to execute the loan guaranty on its behalf. In a Report and Recommendation dated August 3, 1994, Magistrate Judge Chrein concluded that Byron lacked actual authority to sign the guaranty, but that there were remaining issues of fact as to whether Crossland could recover on the basis of apparent authority. The district court approved the Report and Recommendation and denied Providence's motion for summary judgment on February 24, 1995.
 
 
 16
 The court then conducted a bench trial on the question of whether Crossland reasonably relied on any act or failure to act on the part of Providence, so as to create apparent authority that would bind Providence to the guaranty. At the bench trial on February 5, 1996, the parties stipulated to many of the pertinent facts and to the admissibility of a number of deposition transcripts, and each side called a single witness. In a Memorandum and Order dated February 26, 1996, the district court determined that Crossland was entitled to recover on a theory of apparent authority and ordered judgment for Crossland in the amount of $621,000 plus interest. This appeal followed.DISCUSSION
 
 
 17
 We will set aside a district court's findings of fact following a bench trial only if those findings are clearly erroneous. Fed.R.Civ.P. 52(a); United States v. Coppola, 85 F.3d 1015, 1019 (2d Cir.1996). Under this standard, factual findings by the district court will not be upset unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "However, the district court's application of those facts to draw conclusions of law, including a finding of liability, is subject to de novo review." Travellers Int'l A.G. v. Trans World Airlines, 41 F.3d 1570, 1575 (2d Cir.1994). So called mixed questions of law and fact are also reviewed de novo. Id.
 
 
 18
 The single question presented on this appeal is whether Crossland was entitled to recover on the ground that Byron had apparent authority to sign the loan guaranty on behalf of Providence. (The district court decided this case under New York law, and neither party has questioned that ruling on appeal.) "[T]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal--not the agent." Ford v. Unity Hospital, 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973). The inquiry therefore centers on the "words or conduct of the principal [Providence], communicated to a third party [Crossland], that give rise to the appearance and belief that the agent [Byron] possesses authority to enter into a transaction [the loan guaranty]." Hallock v. State, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984). To recover on a theory of apparent authority, Crossland must establish two facts: (1) Providence was responsible for the appearance of authority in Byron to sign the guaranty and (2) Crossland's reliance on the appearance of authority in Byron was reasonable. See Herbert Constr. Co. v. Continental Ins. Co., 931 F.2d 989, 993-96 (2d Cir.1991) (discussing New York cases).
 
 
 19
 A. Responsibility for Byron's Appearance of Authority.
 
 
 20
 The district court concluded that Providence vested Byron with the apparent authority to sign the loan guaranties by giving Byron responsibilities (as Byron testified) on a par with those of a chief financial officer in a commercial corporation, and by giving Byron a title--Vice President for Business Affairs--commensurate with those responsibilities. We think that this conclusion is adequately supported by the record.
 
 
 21
 Providence does not dispute that Byron's title could be understood as vesting him with powers comparable to those of a corporate CFO. Rather, Providence argues that Byron's title and responsibilities are beside the point, because Crossland cannot demonstrate that it actually relied (reasonably or otherwise) on Byron's title or role in making the loans. The guaranty itself does not reveal Byron's title; and the record does not reflect that anyone at Crossland knew what his title was at the time the guaranty was received and the first loan was made.[3] Although letters on Byron's letterhead were placed in Crossland's loan file before the second and subsequent loans were made (i.e., the loans that Providence is held to have guaranteed), it is stipulated that Crossland can identify no one at the bank who specifically recalls having relied on the Byron letters in the loan file when deciding whether to rely on the Byron guaranty in making the loans.
 
 
 22
 However, the Crossland Vice President involved in the making of the second through fifth loans testified that he inevitably would have reviewed the entire credit file before authorizing the loans and therefore would have seen one or both of the Byron letters reflecting his signature and title. This testimony by Arnold Kastenbaum as to his general practice was sufficient to support the district court's inference that Kastenbaum would have examined the Byron letters before approving the second and subsequent loans on which he worked. Therefore, we cannot say that the district court erred in concluding that Crossland relied upon Byron's name and title in concluding that Byron was authorized to execute the guaranty. The question remains, however, whether such reliance was reasonable in light of the nature of the transaction at issue and the circumstances surrounding that transaction.
 
 
 23
 B. The Duty of Inquiry and Reasonable Reliance.
 
 
 24
 The general rule in New York is that a third party "who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 703 (2d Cir.1990) (quoting Ford v. Unity Hospital, 32 N.Y.2d at 472, 346 N.Y.S.2d 238, 299 N.E.2d 659). However, in the apparent authority context, the duty of inquiry arises only when (1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud. Herbert Constr. Co., 931 F.2d at 995-96 (citing cases). The duty of inquiry into an agent's apparent authority "amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal." Id. at 996.
 
 
 25
 The district court determined that Crossland's reliance on Byron's apparent authority was reasonable and that Crossland's duty of inquiry was not triggered. The court premised this conclusion on a number of findings. First, the loans were guaranteed for an asbestos removal project, obviously an important institutional goal for the College. Second, the guaranty benefitted Providence by assuring that the work on this significant project would be done by the contractor of Providence's choice. Third, Providence enjoys a reputation as a "distinguished and respected educational institution," thought by Crossland to be in sound financial condition. Finally, the district court relied on Providence's expert witness, Robert Martinsen, who testified that a corporate CFO generally has the authority to sign guaranties.
 
 
 26
 The record supports the district court's findings that Providence is a respected institution, that the asbestos abatement project was important to it, and that the underlying loan transaction was in the College's interest. On the other hand, there is no record evidence that the Renzi companies were Providence's "preferred" contractors--in the sense that Providence would put its credit behind them rather than use other firms--and that Crossland would have known this. The Renzi companies bid on the project, as they had on projects past; and they submitted the lowest bid; there is no basis for assuming that they were selected in lieu of other qualified firms for any other reason.
 
 
 27
 As to Martinsen's statement that corporate CFOs are ordinarily empowered to sign guaranties, Martinsen's specific testimony was: "though one could assume that being a chief financial officer he ... might have the power to sign, [y]ou still don't know that without having a corporate resolution." The district court did not credit that caveat--or Martinsen's opinion that it was unreasonable to accept the Byron guaranties without further inquiry--because Martinsen's expertise was derived mostly from his experience in the commercial banking field, not savings banks. The record does not suggest, however, a material distinction in experience between commercial banks and savings banks on this question, and (as we discuss below) Kastenbaum's testimony indicates that such guaranties would also be oddities in savings bank transactions.
 
 
 28
 Even if we accept all of the district court's findings, including the College's preference among contractors, we still conclude that the guaranty transaction at issue was novel and extraordinary, and therefore one that put the bank on inquiry notice as to Byron's apparent authority.
 
 
 29
 The financial and institutional reputation of Providence College is comforting if one is considering whether the College will honor its obligations, but that reputation has little bearing on whether the College has undertaken the obligation or on whether a particular transaction is novel or extraordinary. If a transaction is novel or extraordinary for a particular institution, it raises the eyebrow even if it is entered into for a vital purpose. Ultimately, the question is whether the particular transaction falls within the range of transactions in which Providence or similarly situated institutions normally engage. See General Overseas Films, Ltd. v. Robin Int'l, Inc., 542 F.Supp. 684, 690 (S.D.N.Y.1982) (Sofaer, J.), aff'd, 718 F.2d 1085 (2d Cir.1983).
 
 
 30
 Crossland bears the burden of establishing that the transaction was neither extraordinary nor novel. See Herbert Constr. Co., 931 F.2d at 993-94, 996 (plaintiff must establish reasonable reliance, and duty of inquiry amounts to an alternative way of asking whether reliance was reasonable). The record evidence in this case establishes that the loan guaranty was an unusual one for a non-profit educational institution, and therefore suspect for purposes of inquiry notice. There is no record evidence that Providence had ever before guaranteed the loans of companies doing work on its campus, or that non-profit educational institutions regularly or even sometimes guarantee such loans. Crossland's Arnold Kastenbaum--the individual in charge of approving a number of the loans supposedly guaranteed by Providence--was asked how many times in his experience he had come across a college guaranteeing the loan of a commercial company; he answered, "I'd say--it is a rare circumstance, I have not seen that circumstance." Similarly, Providence's expert witness, Robert Martinsen, testified that in his 38 years in commercial banking, he could not recall a single instance in which a college served as a loan guarantor. Thus, the undisputed evidence presented by both parties indicates that the Providence guaranty of the construction loans was an unusual and rare transaction for a college.
 
 
 31
 Crossland argues that there was a pre-existing relationship between the Renzi companies and Providence, relying on Bernard Renzi's deposition testimony that his companies had been doing business with Providence for over thirty years. However, the issue presented is whether the transaction should have put Crossland on inquiry notice. And as to that, there is no evidence that Crossland knew of the prior relationship between Providence and the Renzi companies.
 
 
 32
 The terms of the loan guaranty signed by Byron also made it a novel and extraordinary transaction. First, the guaranty was in respect of loans the proceeds of which could be used for work done by the Renzi companies anywhere. Second, the guaranty covered the future indebtedness of the Renzi companies (up to $621,000) without restriction. Finally, Providence had no ownership or equity interest in the companies for whose loans it was apparently giving so broad a guaranty. In sum, the supposed undertaking by Providence was an unrestricted and continuing guaranty to a third party having no corporate relationship to the College. Such a guaranty by a non-profit educational institution was (on this record) both extraordinary and novel. And among other odd circumstances, the guaranty form itself did not bear Byron's title or the corporate seal. Accordingly, Crossland's reliance on Byron's apparent authority was not reasonable. The facts and circumstances surrounding the loan guaranty were sufficient to put Crossland on notice and to trigger Crossland's duty to inquire whether Byron actually possessed the authority to sign the guaranty.
 
 
 33
 We thus conclude that the district court clearly erred in finding that Crossland's reliance was reasonable, and therefore erred in holding that Crossland was entitled to recover on the ground that Byron possessed apparent authority.
 
 CONCLUSION
 
 34
 For the reasons set forth herein, we reverse the judgment of the district court and direct that judgment be entered dismissing Crossland's claims against Providence College.
 
 
 
 [1]
 In January 1992, all of the assets and liabilities of Crossland Savings were transferred to Crossland Federal Savings Bank. At the same time, the Federal Deposit Insurance Corporation was appointed as conservator for Crossland Federal. Subsequently, the FDIC resigned as conservator for Crossland Federal, and Crossland Federal was later merged into Republic National Bank of New York. We refer to plaintiff throughout as Crossland
 
 
 [2]
 The district court listed seven loans purportedly covered by the guaranty. On appeal, Crossland contends there were eight loans, adding a loan dated March 7, 1989 in the amount of $450,000 for an asbestos removal project that appears to be unrelated to Providence. Although this loan was mentioned in Crossland's complaint, it was omitted from the district court's list of loans in its findings of fact. The loan offering memorandum accompanying this loan does not mention that Providence is a guarantor of the loan. It is therefore not at all clear that the balance on this loan should be considered guaranteed by Providence. However, because we determine below that Providence has no liability to Crossland, we need not decide the issue
 
 
 [3]
 Although this fact is not dispositive--because Crossland seeks payment on loans made after Crossland could have learned of Byron's title from the letters in the loan file--it does speak to Crossland's generally lackadaisical manner in verifying the validity of the guaranty. One might view in a similar light, Crossland's acceptance, in conjunction with the second through fifth loans, of additional Providence guaranties signed by James Cunningham, who was not even an officer at the College