T.C. Memo. 1999-385


UNITED STATES TAX COURT


DAVID ALLEN, TRANSFEREE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF SLOAN ALLEN, DECEASED, DAVID ALLEN,
ALLEGED EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24984-97, 24985-97,    Filed November 24, 1999.
24986-97, 24987-97.


Andrew Pick O'Meara III, Louis James Marett, and Audranne

F. Mixon, for petitioners.

Ronald F. Hood, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, Judge: These cases were consolidated for purposes of

trial, briefing, and opinion.

Pursuant to separate notices of deficiency, respondent determined that the Estate of Sloan Allen is liable for Federal estate and income taxes, plus additions to tax, as follows:

Estate of Sloan Allen

Estate Tax Liability:

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Docket No. | Deficiency | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) |
|---|---|---|---|---|
| 24986-97 | $5,835,634 | $1,458,909 | $291,782 | [1] |

[1] 50 percent of the interest on the portion of the underpayment attributable to negligence.

Income Tax Liability:

| | | | Additions to Tax | | |
| | | | Sec. | Sec. | Sec. |
| Docket No. | Year | Deficiency | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) |
|---|---|---|---|---|---|
| 24987-97 | 1987 | $278,253 | $69,563.25 | $13,912.65 | [1] |

[1] 50 percent of the interest on the portion of the underpayment attributable to negligence.

Pursuant to separate notices of transferee liability, respondent determined that David Allen is liable both as the fiduciary of the Estate of Sloan Allen (sometimes referred to as Sloan's estate or the estate) and as a transferee of the assets of the estate for unpaid Federal estate and income taxes, plus additions to tax, owed by the estate, as follows:

<u>David Allen, Transferee</u>

    <u>Estate Tax Liability</u>:

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| <u>Docket No.</u> | <u>Deficiency</u> | <u>6651(a)(1)</u> | <u>6653(a)(1)(A)</u> | <u>6653(a)(1)(B)</u> |
| 24985-97 | $5,835,634 | $1,458,909 | $291,782 | [1] |

[1]    50 percent of the interest on the portion of the underpayment attributable to negligence.

    <u>Income Tax Liability</u>:

| | | | Additions to Tax | | |
| | | | Sec. | Sec. | Sec. |
| <u>Docket No.</u> | <u>Year</u> | <u>Deficiency</u> | <u>6651(a)(1)</u> | <u>6653(a)(1)(A)</u> | <u>6653(a)(1)(B)</u> |
| 24984-97 | 1987 | $278,253 | $69,563.25 | $13,912.65 | [1] |

[1]    50 percent of the interest on the portion of the underpayment attributable to negligence.

    The issues for decision are: (1) Whether David Allen is the executor of the Estate of Sloan Allen pursuant to section 2203, and if so, whether the notices of deficiency mailed to him in that capacity with respect to Federal estate and income taxes and additions to taxes are valid; (2) whether David Allen is liable as fiduciary of the Estate of Sloan Allen pursuant to 31 U.S.C. section 3713(b) (1994), for unpaid Federal estate and income taxes, and additions to tax, owed by the estate; and (3) whether David Allen is liable as a transferee pursuant to section 6901 for unpaid Federal estate and income taxes, and additions to tax, owed by the estate.

    Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

Background

At the time David Allen (David) filed petitions for each of the docketed cases involved herein, he resided in Neu Chatel, Switzerland. David is the only child of Sloan and Margaret Allen.

David was born on April 22, 1930. In 1950, he received a bachelor of science degree in engineering from Yale University. In 1953, he received a master's degree in business administration from Harvard University. He attended Harvard Law School for 3 years but did not receive a degree.

David and Sloan Allen (Sloan) lived together at 3722 Dewey Avenue, Omaha, Nebraska, from 1932 until Sloan's death in 1987. They walked to and from work together daily and often dressed alike.

Baum Meyer Co.

David and Sloan worked at Baum Meyer Co. (Baum), their wholly owned corporation. As of the date of Sloan's death, David was the president and chairman of the board of directors of Baum; Sloan did not hold an official position at Baum.

Before July 7, 1976, Sloan owned 604 shares of Baum stock and David owned 580 shares. On July 7, 1976, Sloan gave David 575

shares of Baum stock.  On December 12, 1976, Sloan sold 24 shares of Baum stock to David for $6,768.  On January 1, 1977, Sloan transferred his remaining 5 shares of Baum stock to David.  Thereafter, David owned all 1,184 outstanding shares of Baum stock.

Margaret's Death

Margaret Allen (Margaret) died on November 24, 1970.  Sloan and David were her only heirs.  Sloan was the executor of Margaret's estate.

Margaret's will was probated in the County Court of Douglas County, Nebraska (county court).  Her estate was appraised at $358,151.17.  Sloan inherited $174,463.75, including 2,500 shares of Standard Oil stock.  David inherited $152,059.20.

On January 17, 1972, Sloan, in his capacity as executor, filed a Form 706, U.S. Estate Tax Return, with the Internal Revenue Service (IRS) for Margaret's estate.  Margaret's estate was liable for Federal estate tax of $23,114.58. In addition, Margaret's estate was subject to a Nebraska State inheritance tax of $1,420.59, which was paid out of David's share of the estate.

Sloan's Death

On February 27, 1987, Sloan was admitted to Methodist Hospital in Omaha, Nebraska.  David informed the hospital that Sloan was widowed.  Sloan died intestate on March 8, 1987.

On March 9, 1987, David contacted Terry Kuchera, a local funeral director at Crosby, Kunold, Burket Funeral Chapels (Funeral

Chapels), to arrange for his father's funeral. (Funeral Chapels had previously handled Margaret's funeral and burial.) David provided Mr. Kuchera with information about his father. David told Mr. Kuchera that his father died a widower. David paid the funeral costs. He instructed Mr. Kuchera not to place a notice of his father's death in the local newspaper. Only four individuals attended Sloan's funeral and burial services: David, Mr. Kuchera, another Funeral Chapels employee, and Reverend Jack Fricke.

D.A. Baum Trust

Sloan was trustee and beneficiary of the D.A. Baum Trust (the trust) from which he received income quarterly. (In 1985 and 1986, Sloan received distributions of $19,375 and $20,218, respectively, from the trust.) Following his father's death, David was the sole trustee and beneficiary of the trust.

As of March 8, 1987, the corpus of the trust consisted of 5,616 shares of Exxon Corp. (Exxon) stock, valued at $81.23 per share for a total of $456,500. On March 12, 1987, the trust received $5,054 in dividend income from the Exxon stock.

On August 13, 1987, the shares of Exxon stock were split 2 for 1. On September 18, 1987, the trust surrendered: (1) 5,616 shares of Exxon stock (certificate No. M823453); and (2) 5,616 additional shares of Exxon stock (certificate No. U0327703). Subsequently, a certificate for 11,232 shares of Exxon stock (certificate No.

832219) was issued in the names of Sloan and David, Trustees, U-A 12-30-1938, for David's benefit.

## Sloan's Exxon and Standard Oil Stock

On the date of his death, Sloan owned 110,000 shares of Exxon and Standard Oil stock (the 110,000 shares of stock), as represented by 198 stock certificates, having a market value of $8,937,500. Shortly following Sloan's death, the 110,000 shares of stock were sold for a total of $9,650,977.92. Sloan's purported signature appeared on the back of each of the 198 stock certificates. Several entities were used to accomplish the sale of the 110,000 shares of stock: Bank Ehinger & CIE, AG (BECIE) of Basel, Switzerland; Brown Brothers Harriman & Co. (BBH) of New York; Depository Trust Co. (DTC) of New York; and Cede & Co. On March 24, 1987, BBH received the 110,000 shares of stock from BECIE, and on March 25, 1987, BBH deposited the 110,000 shares with DTC. These shares were sold in accordance with instructions received from BECIE contained in a March 19, 1987, letter. The proceeds of the sales, $9,650,977.92, were credited to BECIE's account at BBH.

## Sloan's Morgan Guaranty Trust Co. Checking Account

On the date of his death, Sloan had a checking account at Morgan Guaranty Trust Co. of New York (Morgan Guaranty checking account) with a balance of $357,040.39. Shortly after Sloan's death, two deposits were made into that checking account: (1) On

March 11, 1987, a $99,000 check was deposited, representing accrued dividends arising from Sloan's ownership of the 110,000 shares of stock; and (2) on March 12, 1987, a $5,054 check was deposited, representing a distribution from the trust (arising from dividends from Exxon Corp.).

Checks were drawn on the Morgan Guaranty checking account following Sloan's death.  The following checks were made payable to Sloan, contained his purported signature as maker, and were purportedly endorsed by Sloan:

| Check No. | Date of Check | Amount | Date Paid |
|---|---|---|---|
| 402 | unknown | $15,289.56 | 4/20/87 |
| 403 | unknown | 14,998.61 | 4/22/87 |
| 404 | unknown | 15,241.71 | 4/22/87 |
| 405 | unknown | 15,261.31 | 4/15/87 |
| 406 | unknown | 14,965.41 | 4/17/87 |
| 409 | unknown | 15,425.61 | 4/23/87 |
| 411 | unknown | 15,024.65 | 4/27/87 |
| 412 | unknown | 15,037.42 | 4/28/87 |
| 413 | unknown | 14,905.72 | 4/30/87 |
| 414 | unknown | 15,116.71 | 4/30/87 |
| 415 | 4/29/87 | 15,337.41 | 5/5/87 |
| 416 | 4/30/87 | 14,989.42 | 5/5/87 |
| 418 | 5/4/87 | 14,905.88 | 5/7/87 |
| 419 | 5/5/87 | 15,334.26 | 5/7/87 |
| 421 | 5/7/87 | 14,987.21 | 5/11/87 |
| 422 | 5/8/97 | 15,105.25 | 5/13/87 |
| 423 | 5/11/87 | 15,243.66 | 5/13/87 |
| 427 | 5/14/87 | 14,975.25 | 5/18/87 |
| 428 | 5/15/87 | 14,995.26 | 5/19/87 |
| 429 | 5/18/87 | 15,275.24 | 5/20/87 |
| 431 | 5/19/87 | 14,678.89 | 5/26/87 |
| 434 | 5/20/87 | 12,500.00 | 5/25/87 |
| 437 | 5/20/87 | 6,990.20 | 5/26/87 |
| 439 | unknown | 33,500.00 | 4/21/87 |
| 440 | unknown | 15,102.02 | 4/23/87 |
| 441 | 5/12/87 | 15,441.62 | 5/14/87 |
| 442 | 5/13/87 | 15,221.56 | 5/15/87 |
| 443 | 5/6/87 | 15,224.78 | 5/11/87 |
| 444 | 5/4/87 | 15,011.75 | 5/7/87 |
| 448 | unknown | 15,008.42 | 4/27/87 |

As of May 31, 1987, the balance in the Morgan Guaranty checking account was zero.

Sloan's First National Bank of Omaha Account

On March 8, 1987, Sloan had an account at the First National Bank of Omaha, with a balance of $5,089.17. By September 29, 1987, the balance in this account was zero.

Tax Returns

On July 7, 1976, Sloan filed a Form 709, U.S. Quarterly Gift Tax Return, on which he reported giving 575 shares of Baum stock to David. On that return, Sloan reported his marital status as "single".

On January 2, 1986, Sloan filed a Form 1040, U.S. Individual Income Tax Return, for 1985. His filing status was listed as "head of household" (with David listed as his qualifying child). On January 22, 1987, Sloan filed a Form 1040 for 1986. His filing status was listed as "head of household".

Fiduciary income tax returns were filed for the trust for 1985 and 1986, reporting $19,375 of dividend income for 1985 and $20,218 of dividend income for 1986.

Sloan's estate did not file either a Federal estate or a fiduciary income tax return. Nor was a Federal income tax return for Sloan filed for the period January 1 to March 8, 1987.

IRS Investigation of Sloan Individually

In May 1991, Revenue Officer Lucille Sutton (Ms. Sutton) began an investigation regarding Sloan's failure to file a 1987 individual return. During the course of this investigation, she discovered that Sloan and/or his estate had wages and dividend income in 1987 but no returns reporting such income had been filed.

On February 12, 1992, Ms. Sutton went to Baum's office in order to speak to David about his father. She was told that David was out of the office. She left her business card, requesting David to contact her. Because David failed to do so, Ms. Sutton attempted to reach him by telephone on February 14, 1992. She was told that David was in a meeting; again, she left a message requesting David to return her call. David again failed to contact her.

On February 19, 1992, Ms. Sutton again attempted to speak with David by telephoning him at work. She was told that David was attending a business luncheon. Ms. Sutton left a message with a Baum employee, again requesting that David telephone her.

Despite Ms. Sutton's leaving numerous messages for David at Baum, David never contacted Ms. Sutton. Consequently, on March 20, 1992, she made another visit to Baum's office. There, she spoke with a Mr. Richardson, a Baum employee, who informed her that: (1) David was out of town; (2) Sloan was deceased (although Mr. Richardson did not know the date of death); and (3) Sloan was

David's father.  At the end of their conversation, Ms. Sutton gave Mr. Richardson her business card to relay to David.  David failed to contact her.  Accordingly, on April 1, 1992, she made a third visit to Baum's office, in order to serve a summons on David. (The summons requested all available information relating to Sloan's income or any estate, trust, or other fiduciary of Sloan for 1987 through 1991.)  When Ms. Sutton arrived at Baum's offices, she was informed that David was not there.  She then drove to David's residence to serve the summons, but the outer gate was padlocked.  Ms. Sutton subsequently returned to Baum's offices, and by happenstance, met David.  David asked Ms. Sutton to meet him later that afternoon at his accountant's office to discuss the summons; they so met.  Ms. Sutton served the summons on David, explaining that he was to appear at her office on April 13, 1992, with the requested information.  Ms. Sutton asked David when his father died; David replied that he did not know the date of Sloan's death.  Ms. Sutton further asked David whether his father's estate was probated; David responded by stating that information could be obtained by looking at the county court records.  Ms. Sutton told David that it would be difficult ascertaining information about Sloan's estate without knowing Sloan's date of death.  David replied by stating that he did not have much information about his father.  The meeting then concluded.

After examining the county court records, Ms. Sutton discovered that Sloan's estate was not probated. She also secured a copy of Sloan's death certificate from the Bureau of Vital Statistics.

On April 13, 1992, David appeared at Ms. Sutton's office, in response to the summons. David gave her the following: Documents concerning Sloan's medical and funeral expenses; a copy of an estimated tax payment made with regard to Sloan's 1987 tax year; and some 1987 monthly bank statements from Sloan's checking account. Missing from these documents were Sloan's April and May 1987 checking account statements, as well as canceled checks drawn from this account.

During this meeting, Ms. Sutton asked David whether he was a trustee or executor of his father's estate. David replied that he was unable to answer that question. He suggested that in order to receive a response, the IRS should pose this question to Sloan's wife ("Mrs. Allen"), who lives in Europe. David stated he did not know "Mrs. Allen's" first name or address. Ms. Sutton then requested further details regarding this "Mrs. Allen". David stated that in order for him to disclose details, a deposition would be required. The meeting then concluded.

Later that day (April 13, 1992), David returned to Ms. Sutton's office in order to retrieve the documents provided to her earlier that day. At this second meeting, she informed David that

she had located a copy of Sloan's death certificate, which stated that his father was widowed at the time of his death. David changed the subject by commenting on the weather that day and expressing his concern as to how Ms. Sutton would travel home.

Approximately a week later, Ms. Sutton issued two additional summonses (both dated April 21, 1992). The first was issued to Chicago Trust Co. for documents relating to the shares of stock Sloan owned at the time of his death. The second was issued to Morgan Guaranty for bank statements of Sloan's checking account from April 1 to May 31, 1987. On April 29, 1992, the Morgan Guaranty statements were sent to Ms. Sutton. After examining these statements, Ms. Sutton issued another summons (dated May 15, 1992) to Morgan Guaranty requesting all canceled checks from Sloan's checking account issued from April 1 through May 31, 1987. Morgan Guaranty sent her copies of a portion of the canceled checks; all were dated after Sloan's death. In accordance with Morgan Guaranty's normal business practice during 1987, the original canceled checks were returned to Sloan at his home (3722 Dewey Avenue, Omaha, Nebraska) along with the monthly bank account statements.

During the course of her investigation, Ms. Sutton reviewed Sloan's 1985 and 1986 income tax returns in which he had claimed head of household status, with David as his qualifying child.

IRS Investigation of Sloan's Estate's Tax Liabilities

Thomas M. McGuire, Jr., an IRS estate and gift tax attorney, was assigned to examine Sloan's estate.  By letter dated May 31, 1994, Mr. McGuire requested David to appear at his office on June 23, 1994, with specific information set out in the letter.  David failed to appear.

Four days later, David telephoned Mr. McGuire to discuss the May 31, 1994, letter.  David explained that he had injured his back and was in the eastern part of the United States.  Mr. McGuire asked David for his current address or telephone number; David refused.  Mr. McGuire then asked David to reply in writing to his May 31, 1994, letter.  Again, David refused to do so.  Next, Mr. McGuire asked David if his father owned publicly traded stocks; David claimed to be unaware of any such stocks.

As this telephone conversation continued, David informed Mr. McGuire that there were 1,184 shares of Baum stock outstanding and that there was a "Mrs. Allen", his father's second wife, who lived in France and had access to Sloan's financial records, wills, codicils, and trust instruments.  David stated that he had no information about "Mrs. Allen".

By letter dated July 1, 1994, Mr. McGuire advised David that because he had not sent the previously requested records, David would have to appear at his office on July 15, 1994, with the requested documents.  David failed to appear on that date.

Mr. McGuire issued a summons dated July 28, 1994, to David requesting the identical items that had been requested in his May 31, 1994, letter.  David was instructed to appear on August 16, 1994, at 9 a.m., in Mr. McGuire's office in response to the summons.  David neither appeared on August 16 nor telephoned Mr. McGuire.

On August 29, 1994, David appeared at Mr. McGuire's office unannounced, wishing to discuss the information requested in Mr. McGuire's May 31, 1994, letter.  They had a brief discussion.  The next day, David returned to Mr. McGuire's office.  David explained that for years he had lived with his father in the same residence and worked with his father at Baum since his high school days.  He then reiterated his former comments regarding the existence of a "Mrs. Allen".  He added that children may have resulted from that marriage but had no further details.  David insisted that "Mrs. Allen" had all of his father's financial records.  David repeated that he knew nothing about his father's personal and financial business.  The August 30, 1994, meeting between Mr. McGuire and David was their last.

Mr. McGuire attempted to verify the existence of a "Mrs. Allen".  First, he sent a letter to the Nebraska Bureau of Vital Statistics, inquiring whether Sloan had applied for a marriage license at any time following Margaret's death.  The response was negative.  Second, Mr. McGuire contacted the U.S. Department of

State inquiring whether a passport had ever been issued to a "Mrs. Allen". Again, the response was negative. Third, Mr. McGuire reviewed Sloan's individual income tax returns filed before his death; no spouse was ever listed. Further, Sloan's death certificate stated that Sloan had died a widower. Accordingly, Mr. McGuire concluded that there was no "Mrs. Allen".

Mr. McGuire discovered that although David marked the "no" box in response to the question of whether he had foreign bank accounts during 1987 on Schedule B of his 1987 return, David had at least three foreign bank accounts during 1987. (In his answer to respondent's interrogatory No. 1 (which requested that David list all domestic and foreign bank accounts, securities accounts, and other financial accounts in which he had an interest or a signature or other authority over at any time during 1987), David responded by listing only two domestic accounts--the Morgan Guaranty checking account and the Bank of Omaha account.) After being confronted with certified transcripts indicating he had foreign accounts, David admitted to the fact. (On his individual tax returns for 1988-91, David listed foreign bank accounts in the United Kingdom and Switzerland but did not report any interest income from these accounts.)

On the basis of his investigation, Mr. McGuire concluded that David was the only individual who could possibly possess information about Sloan's assets.

Creation of the Liechtenstein Corporation

On August 30, 1994 (the last day David and Mr. McGuire discussed these cases), David executed a warranty deed, transferring the real property located at 1221 Harney Street, Omaha, Nebraska (the property where the offices of Baum were located), to the Christiania Corp., AG, of Vaduz, Liechtenstein, for a stated consideration of $1. On October 6, 1994, David filed the warranty deed with the Douglas County Registry of Deeds reflecting that he had sold this real property to the Christiania Corp.

On May 29, 1995, through an accountant to whom he had given his power of attorney, David filed a 1994 Form 709, U.S. Gift and Generation-Skipping Transfer Tax Return. Reflected on this form were two gifts David made to Christiania Corp.: (1) On August 30, 1994, David gave the corporation his residence (including a house, lot, and garage) at 3722 Dewey Drive, Omaha, Nebraska, and (2) on September 15, 1994, David gave the corporation his 1,184 shares of Baum stock (representing 100 percent of Baum's outstanding shares of stock).

ULTIMATE FINDINGS OF FACT

1. Sloan died on March 8, 1987, with a gross taxable estate of $11,606,904. Following Sloan's death, David took possession of Sloan's assets. David is the executor of Sloan's estate within the purview of section 2203.

2.   David was the fiduciary (personal representative) of Sloan's estate within the purview of 31 U.S. section 3713(b). David is responsible for the payment of income and estate taxes, as well as additions to tax, owed by Sloan's estate.

3.   After Sloan's death on March 8, 1987, his estate was insolvent. As personal representative of Sloan's estate, David transferred to himself all the assets of Sloan's estate.  David is liable as a transferee of the assets of Sloan's estate for the income and estate taxes, as well as additions to tax, owed by Sloan's estate.

## OPINION

Preliminarily, we must determine whether Sloan's purported signatures on the stock certificates (representing the 110,000 shares) and checks (hereinafter referred to as stock certificates and checks) were genuine.

Handwriting Experts

Each party presented an expert to determine the genuineness of Sloan's purported signatures on the stock certificates and checks. The experts agreed that Sloan's purported signatures on the stock certificates and checks were either traced or simulated;[1] thus,

---

[1]   A "tracing" occurs where an individual creates a mechanical copy of another's signature by handwriting. "Simulated" is defined as an effort to copy the handwriting style or characteristics of another.

both agreed that Sloan's purported signatures on the stock certificates and checks were not genuine.

Neither expert was able to conclude that it was David who had forged Sloan's signature.[2] Respondent's expert observed "indications" that David forged his father's signature on the stock certificates and checks. Petitioner's expert could not opine as to who authored the forged Sloan signatures because the documents he was provided with were photocopies, not originals.

On the basis of the entire record before us, we conclude that (1) Sloan's signatures on the stock certificates and checks were not genuine, and (2) David forged his father's signatures on the stock certificates and checks. With these conclusions in mind, we now address the substantive issues before us.

----

[2] Following several conference calls with the Court, David provided two handwriting exemplars in London, England, on Jan. 28 and Feb. 27, 1999, overseen by an Internal Revenue Service representative (but not the expert witnesses herein).

In examining the London exemplars, respondent's expert concluded that David was attempting to deliberately disguise his own natural handwriting. Petitioner's expert admitted that although David's London exemplars contained the classic signs of disguise, he could not opine as to whether David had disguised those exemplars because he did not personally observe David performing the exemplars. We accept the opinion of respondent's expert and conclude that David deliberately attempted to disguise his own handwriting.

The parties' experts were provided with copies of the following: The London exemplars; the stock certificates representing the 110,000 shares, and checks; and known collected writings, such as other "normal business exemplars".

David Is the Executor of Sloan's Estate

We now consider whether David is the executor of Sloan's estate pursuant to section 2203. For estate tax purposes, an "executor" means "the executor or administrator of the decedent, or, if there is no executor or administrator appointed, qualified, and acting within the United States, then any person in actual or constructive possession of any property of the decedent." Sec. 2203. In the instant case, Sloan's estate was not probated; hence, David can only be deemed the "executor" of Sloan's estate for tax purposes if he had actual or constructive possession of property belonging to Sloan. For the reasons set forth, we conclude David had actual possession of Sloan's property following the date of Sloan's death.

On the date of his death (March 8, 1987), Sloan held over $11 million in assets, including: (1) Funds in two checking accounts; (2) 110,000 shares of stock (with an $8,937,500 market value); (3) a beneficial interest in the trust (consisting of 5,616 shares of stock, with a $456,500 market value); and (4) various other valued assets.[3] There is ample evidence in the record linking David to actual possession of these assets.

---

[3] The parties disagree as to whether Sloan had $1,728,362 cash on hand at the time of death. We accept Mr. McGuire's conclusion that Sloan's ownership of the 110,000 shares of stock generated approximately $1,728,362 in dividends between 1980 and 1985.

First, on the date of Sloan's death, the Morgan Guaranty checking account had a $357,040.39 balance. Several days later, David deposited dividend checks therein, increasing the balance to $461,094. Starting in April 1987, and continuing through May 1987, David forged Sloan's signature on 30 checks, generally in $15,000 increments, drawn on the Morgan Guaranty checking account made payable to Sloan. On May 31, 1987, David had reduced the balance to zero.

Second, because we have concluded that David forged his father's signature on the Exxon and Standard Oil stock certificates, it follows that he had to have possession of the stock certificates in order to do so.

Because we conclude that David was in actual possession of his father's property, we hold that David is the executor of Sloan's estate pursuant to section 2203.

Pending Motions

Motions filed by petitioner in docket Nos. 24986-97 and 24987-97 are pending involving (1) whether respondent's notices of deficiency to Sloan's estate are valid, and (2) if those notices are valid, whether David had authority to file petitions in this Court contesting the determinations contained in those notices. Also pending are motions filed by respondent to dismiss the cases in docket Nos. 24986-97 and 24987-97 on the basis that the estate failed to properly prosecute.

As stated above, because David came into actual possession of his father's assets, David is the statutory executor of Sloan's estate pursuant to section 2203. As such, he was the proper individual to receive the notices of deficiency under section 6212. Accordingly, we hold that the notices of deficiency giving rise to docket Nos. 24986-97 and 24987-97 are valid.

We now turn to whether David had authority to petition the Court on behalf of Sloan's estate. David argues that because no fiduciary of Sloan's estate had been appointed, he improperly filed the petitions in docket Nos. 24986-97 and 24987-97. We disagree. As stated supra, David was the statutory executor of Sloan's estate pursuant to section 2203. As such, pursuant to Rule 60,[4] David had authority to contest the notices of deficiency involved in docket Nos. 24986-97 and 24987-97.

---

[4] Rule 60(a) provides in pertinent part:

Rule 60. Proper Parties; Capacity

(a) Petitioner: (1) Deficiency or Liability Actions: A case shall be brought by and in the name of the person against whom the Commissioner determined the deficiency (in the case of a notice of deficiency) or liability (in the case of a notice of liability), or by and with the full descriptive name of the fiduciary entitled to institute a case on behalf of such person. * * *

We now address respondent's motions to dismiss in docket Nos. 24986-97 and 24987-97 on the basis of Sloan's estate's failure to properly prosecute.  This Court, like every court, has the inherent power, in the exercise of its discretion, to dismiss a case for want of prosecution. See, e.g., <u>Link v. Wabash R.R. Co.</u>, 370 U.S. 626, 629-632 (1962); <u>Harper v. Commissioner</u>, 99 T.C. 533, 540 (1992) (failure to comply with discovery requests and orders or to prepare for trial).   Rule 123(b) provides in relevant part:

> (b) Dismissal: For failure of a petitioner properly to prosecute or to comply with these Rules or any order of the Court or for other cause which the Court deems sufficient, the Court may dismiss a case at any time and enter a decision against the petitioner. The Court may, for similar reasons, decide against any party any issue as to which such party has the burden of proof, and such decision shall be treated as a dismissal * * *.

Paragraph 4.(b) of the petitions in docket Nos. 24986-97 and 24987-97 states that petitioner does not dispute the assumptions used by the Commissioner in determining the estate and income tax deficiencies. (It was not until petitioner's opposition to respondent's motion to dismiss for failure to properly prosecute that petitioner first raised the issue that the two notices of deficiency were arbitrary in connection with the $1,728,362 cash-on-hand adjustment.  See <u>supra</u> note 3.)

Petitioner has the burden of proof in docket Nos. 24986-97 and 24987-97.  Pursuant to Rule 149(b), "Failure to produce evidence,

in support of an issue of fact as to which a party has the burden of proof and which has not been conceded by such party's adversary, may be ground for dismissal or for determination of the affected issue against that party." Petitioner did not introduce any evidence to support the allegations raised in the petitions. Petitioner's continued refusal to bring forward any evidence to support its position in docket Nos. 24986-97 and 24987-97 leads us to conclude that such evidence does not exist. Petitioner has failed to overcome inferences to be drawn from the proven facts or the presumptive correctness of respondent's determination.

In sum, with respect to docket Nos. 24986-97 and 24987-97, we will (1) deny petitioner's motions to dismiss for lack of jurisdiction, and (2) grant respondent's motions to dismiss for failure to properly prosecute.

## Whether David Is Personally Liable for Taxes and Additions to Tax Arising From the Estate of Sloan

We now consider whether David (as the executor and fiduciary of Sloan's estate) is personally liable (pursuant to 31 U.S.C. section 3713(b)) for Federal estate and income taxes, and additions to tax, owed by the estate.

Section 6901 provides for assessment, payment, and collection of a fiduciary's liability under 31 U.S.C. section 3713(b). See sec. 6901(a)(1)(B). A fiduciary is defined as a personal representative, administrator, or any other person acting in a

fiduciary capacity.  See sec. 7701(a)(6).  A claim of the U.S. Government must be paid first when a decedent's estate is insolvent.  See 31 U.S.C. sec. 3713(a)(1)(B).

Pursuant to 31 U.S.C. section 3713(b), a personal representative "paying any part of a debt of the * * * estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government."  Accordingly, the personal representative of an estate is personally liable for the unpaid claims of the United States to the extent of the distribution, if the Government establishes the following: (1) The personal representative distributed assets of the estate; (2) the distribution rendered the estate insolvent; and (3) the distribution took place after the personal representative had notice of the Government's claim.  See 31 U.S.C. sec. 3713(b); see also, e.g., United States v. Estate of Romani, 523 U.S. 517 (1998); United States v. Coppola, 85 F.3d 1015, 1020 (2d Cir. 1996) (executor's distribution of estate assets to family members, rendering estate insolvent, before satisfying estate tax debt to the United States violated 31 U.S.C. sec. 3713(b) and made the personal representative personally liable for the taxes); United States v. Estate of Kime, 950 F. Supp. 950, 954, 959 (D. Neb. 1996).[5]

_____

[5]     Courts have taken an expansive view of the types of
                                                (continued...)

For this liability to ripen, the personal representative must have had actual or constructive knowledge of the debt owed the United States. See New v. Commissioner, 48 T.C. 671, 676-677 (1967); Estate of Johnson v. Commissioner, T.C. Memo. 1999-284. A personal representative is deemed to have knowledge of a debt if he has "actual knowledge of such facts as would put a prudent person on inquiry as to the existence of the claim". United States v. Vibradamp Corp., 257 F. Supp. 931, 935 (S.D. Cal. 1966). The knowing disregard of the debt owed the United States imposes liability on the fiduciary to the extent of the value of the assets distributed after knowledge of the debt is obtained. See Leigh v. Commissioner, 72 T.C. 1105, 1109-1110 (1979).

All three elements of 31 U.S.C. section 3713(b) have been established herein. David is the statutory executor and fiduciary of his father's estate. He distributed the assets of his father's estate to himself as sole heir without paying the debts of the estate at a time he knew the estate owed estate and income taxes

---

[5](...continued)
payments from an estate for which an executor may be held liable under the insolvency statute, including "a distribution of funds [from the estate] that is not, strictly speaking, the payment of a debt." Want v. Commissioner, 280 F.2d 777, 783 (2d Cir. 1960); see sec. 20.2002-1, Estate Tax Regs.; see also United States v. Coppola, 85 F.3d 1015 (2d Cir. 1996). Federal estate and income tax liabilities constitute a debt due to the United States. See, e.g., United States v. Moore, 423 U.S. 77 (1975).

and additions to tax.[6]  And Sloan's estate became insolvent when David distributed all of the estate's assets to himself. Accordingly, David is personally liable in his capacity as the fiduciary (personal representative) of Sloan's estate for the estate and income taxes and additions to tax owed the Government up to the value of the assets distributed to himself.

Because the value of the assets distributed to David ($11.6 million) exceeded the debt owed the IRS, David is personally liable as fiduciary of Sloan's estate under 31 U.S.C. section 3713(b) for the entire amount of the debt.

Whether David Is Personally Liable as a Transferee

Now we turn to whether David is personally liable as a transferee of the assets of Sloan's estate pursuant to section 6901.

The Commissioner may collect unpaid income taxes of a transferor of assets from a transferee of those assets.  See sec. 6901(a)(1), (c)(1); Commissioner v. Stern, 357 U.S. 39, 42 (1958). Section 6901 does not create or define a substantive liability but merely provides a remedy for enforcing the existing liability of the transferor.  See Hagaman v. Commissioner, 100 T.C. 180, 183 (1993).  The Commissioner bears the burden of proving that the

---

[6]    We have no doubt that David knew there would be a considerable amount of Federal taxes due from his father's $11.6 million estate. David was highly educated and sophisticated in business matters.

taxpayer is liable as a transferee.  See sec. 6902(a); Rule 142(d).  Although section 6901 provides a method by which to collect the tax, liability of a transferee is a question of State rather than Federal law, and the law of the State where the transfer took place normally applies.  See Commissioner v. Stern, supra; Fibel v. Commissioner, 44 T.C. 647, 657 (1965).

Here, the transfers took place in Nebraska; consequently, we apply Nebraska law.  Nebraska's Uniform Fraudulent Conveyance Act, Neb. Rev. Stat. secs. 36-601 to 36-613 (reissue 1988), as in effect at the time of the transfers, see Schall v. Anderson's Implement, Inc., 484 N.W.2d 86, 89-90 (Neb. 1992),[7] permits a court to void a debtor's transfer of property if the transfer was made absent fair consideration and left the debtor insolvent (i.e., without enough property to pay his debts), or if the transfer was made with an actual intent to hinder, delay, or defraud a creditor.

Nebraska Rev. Stat. sec . 36-604 (reissue 1988) provides:

> 36-604.  Conveyance  by  insolvent; fraudulent.  Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his or her actual intent if the conveyance is made or the obligation  is  incurred  without  a  fair consideration.

---

[7]    In 1989, the Nebraska legislature enacted the Uniform Fraudulent Transfer Act (UFTA), Neb. Rev. Stat. secs. 36-701 to 36-712 (Cum. Supp. 1990).  The UFTA replaced the 1980 Uniform Fraudulent Conveyance Act (UFCA), Neb. Rev. Stat. secs. 36-601 to 36-613, which is involved herein.

Turning to the situation before us, there was no evidence indicating that David gave any consideration in exchange for his father's assets. We conclude that he did not.

On the date of Sloan's death, his estate was solvent.[8] Thereafter and because David transferred all the assets of the estate to himself, the estate became insolvent. Thus, regardless of David's intent, the transfer of all of Sloan's assets to David is deemed a fraudulent conveyance under Nebraska law.[9]

Additionally, the record herein establishes that David conveyed the assets of Sloan's estate with an intent to hinder or defraud the estate's creditors. Consequently, under Nebraska law,

---

[8] Sloan's estate had assets on Mar. 8, 1987, valued at $11,606,904. The estate tax deficiency due from the estate was $5,835,634. A Nebraska State estate tax of $1,232,735 was due, as well as an inheritance tax of $116,342.32. Also due from the estate was Sloan's income tax liability of $278,253. The record reveals no other liabilities owed by Sloan or his estate. Accordingly, on the date of death the estate was solvent.

[9] Pursuant to Neb. Rev. Stat. secs. 30-201 to 30-244 (reissue 1988), a decedent's property passes to his heirs subject to the claims of his creditors, and a distributee is liable to return property received (or the value thereof if he no longer has it) when a creditor's claim has not been paid. Under Nebraska law, David inherited his father's entire estate. As statutory executor, David distributed the estate's assets to himself. David is a distributee under Nebraska law. As a distributee, he is liable for claims against the estate by creditors, and if he does not have the property received as distributee, he is liable to return the value of the property as of the date of his disposition of the property, and the income and gain he received. See Neb. Rev. Stat. secs. 30-24,107 and 30-24,118 (reissue 1988).

the conveyances to David constitute fraudulent conveyances.  In this regard, Nebraska law provides:

> 36-607.  Conveyances made with intent to defraud. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Neb. Rev. Stat. sec. 36-607 (reissue 1988).

To prove a conveyance of property constitutes a fraudulent conveyance under Neb. Rev. Stat. sec. 36-607, the Commissioner must prove with clear and convincing evidence that there was an intent on David's part to hinder, delay, or defraud the IRS.  See Castellano v. Bitkower, 346 N.W.2d 249, 253 (Neb. 1984).  As discussed infra, we believe the Commissioner has satisfied this clear and convincing standard.

Nebraska law recognizes the following as badges of fraud:  The transfer was for less than fair consideration; the transfer was of the transferor's entire estate; the transfer was made to the transferor's spouse or other family member; the transfer was made while there was pending or threatened litigation against the transferor; the transfer was made secretly or hurriedly; the transfer was made while the transferor was insolvent or greatly in debt; the transfer was a departure from the transferor's usual method of doing business, and the transferor retained possession of

and/or benefits in the transferred property. See <u>Gifford-Hill &</u>
<u>Co. v. Stoller</u>, 380 N.W.2d 625, 630 (Neb. 1986); <u>First Natl. Bank</u>
<u>v. First Cadco Corp.</u>, 203 N.W.2d 770, 778-779 (Neb. 1973); see also
<u>Stanko v. Commissioner</u>, T.C. Memo. 1996-530.

The tangible evidence adduced by respondent herein indicates that there was a planned evasion of Federal and State taxes, and that David masterminded these plans. David moved in on his father's fortune soon after his death. David clearly did not act in good faith.[10] We have set forth in our Findings of Fact many details as to events occurring following Sloan's death. However, we wish to highlight several of them.

First, David did not put a notice of his father's death in the local newspaper; considering all of the circumstances, one could reasonably infer that he refrained from doing so in order to keep his father's death secret from the Federal and State taxing authorities. Second, he secretly and hurriedly transferred Sloan's entire estate to himself as sole heir. Third, after his father's death, David forged his father's signature on the stock certificates representing 110,000 shares of stock and quickly sold them. Fourth, David depleted his father's checking account by

---

[10] See <u>First Natl. Bank v. First Cadco Corp.</u>, 203 N.W.2d 770, 779 (Neb. 1973) ("Where there is a conveyance between close relatives without adequate consideration, the burden is upon the parties to the transaction to establish that it was done in good faith.").

forging his father's name on the checks (all dated after Sloan's death).  Fifth, in response to the summons from Ms. Sutton, David produced some 1987 bank statements (which were sent monthly to 3722 Dewey Avenue) regarding the Morgan Guaranty checking account; noticeably absent were canceled checks or statements for April and May 1987.  Although David possessed the bank statements and canceled checks, he chose to hide the significant ones.

Sixth, David was uncooperative and evasive and made numerous false statements to Ms. Sutton and Mr. McGuire.  He deliberately failed to provide all of the requested documents and information. He forged his father's signature. Presenting no corroborating evidence, and contrary to his own admissions at the time of Sloan's death, David claimed his father was not widowed at death but married to a "Mrs. Allen" in Europe, who had taken all of his father's assets and financial records.  David offered no details regarding this "mystery woman".  Clearly, David's "story" was a fabrication; there is no proof or reason to believe that a "Mrs. Allen" existed.

Seventh, after the estate came under audit by IRS agents, David transferred his property to a foreign corporation in Liechtenstein for no consideration during Mr. McGuire's examination.  David continued his fraudulent conduct by submitting several false answers to respondent's interrogatories, and deliberately disguised his natural handwriting while producing the

London exemplars, hindering the analyses of the handwriting experts.

As noted in <u>Gifford-Hill & Co. v. Stoller</u>, <u>supra</u> at 630 (quoting 37 Am. Jur. 2d, Fraudulent Conveyances, sec. 10, at 701):

> "'[B]adges of fraud'. . . are said to be facts which throw suspicion on a transaction, and which call for an explanation . . . More simply stated, they are signs or marks of fraud. They do not of themselves or per se constitute fraud, but they are facts having a tendency to show the existence of fraud, although their value as evidence is relative not absolute. They are not usually conclusive proof; they are open to explanation. They may be almost conclusive, or they may furnish merely a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case. Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent. . ."

On the basis of the entire record in these cases, we hold that respondent has produced clear and convincing proof under the Nebraska fraudulent transfer statute that David made the transfers with a fraudulent intent, and that David has failed to rebut this proof by any evidence, let alone "strong, clear evidence". <u>Id.</u>; see also <u>Kayian v. Commissioner</u>, T.C. Memo. 1999-296; <u>King Shipping Consum, Inc. v. Commissioner</u>, T.C. Memo. 1989-593.

In sum, respondent presented clear and convincing evidence that David took actual possession of his father's assets after March 8, 1987. David transferred these assets to himself with an actual intent to delay, defraud, or hinder his father's creditors;

namely, the IRS.  Consequently, the transfers from Sloan's estate to David, which rendered the estate insolvent, constitute fraudulent conveyances under Nebraska law.  Consequently, we hold that David is personally liable as a transferee pursuant to section 6901 for the deficiencies and additions to tax respondent determined in docket Nos. 24984-97 and 24985-97.

In reaching our holdings herein, we have considered each argument made by the parties, and, to the extent not discussed above, find those arguments to be irrelevant or without merit.

To reflect the foregoing,

<u>An order will be issued denying petitioner's motions to dismiss for lack of jurisdiction in docket Nos. 24986-97 and 24987-97</u>.

<u>An order of dismissal and decision will be entered granting respondent's motions to dismiss for failure to properly prosecute in docket Nos. 24986-97 and 24987-97</u>.

<u>Decisions will be entered for respondent in docket Nos. 24984-97 and 24985-97</u>.